IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RANDY JAMES GEREN,

               Petitioner,

vs.

MATTHEW CATE, Secretary, California
Department of Corrections and
Rehabilitation,

               Respondent.

No. 2:05-cv-01344-JKS-GGH

MEMORANDUM DECISION

Randy James Geren, a state prisoner, filed a Petition for Habeas Corpus under 28 U.S.C.
§ 2254. Geren is currently in the custody of the California Department of Corrections and
Rehabilitation, incarcerated at the Corcoran State Prison. Respondent has answered, and Geren
has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

In January 2001 Geren was convicted following a jury trial in the Butte County Superior
Court of Murder in the First Degree, Cal. Penal Code § 187, with a finding of true that Geren had
used a deadly weapon, Cal. Penal Code § 12022(b). After denying Geren's motion for a new
trial, the trial court sentenced Geren to an indeterminate prison term of twenty-six years to life.
The California Court of Appeal, Third Appellate District, affirmed Geren's conviction and
sentence in an unpublished, reasoned decision,[1] and the California Supreme Court denied review

---

[1] *People v. Geren*, No. C041543, 2004 WL 187570 (Cal. Ct. App. Jan. 30, 2004).

on April 14, 2004.  Geren, appearing *pro se*, timely filed his Petition for relief in this Court on May 19, 2005.

   After the Petition was filed, counsel was appointed to represent Geren.  Counsel filed an Amended Petition on Geren's behalf and sought a stay and abeyance to exhaust Geren's state-court remedies based upon new evidence that would establish that Geren suffered prejudice as a result of his trial counsel's failure to investigate the effect of Geren's multiple neurological deficits on Geren's ability to formulate an intent to commit murder.  The matter was stayed while Geren exhausted his unexhausted claim in the state courts.

   Geren filed a petition for habeas relief in the California Supreme Court, which was remanded to the Butte County Superior Court for an evidentiary hearing.  At the conclusion of the evidentiary hearing,[2] the Butte County Superior Court denied Geren relief in an unreported, reasoned decision.  The California Supreme Court summarily denied Geren's subsequent petition for habeas relief without opinion or citation to authority on July 13, 2011.  This Court lifted the stay and directed the parties to submit supplemental briefing addressing the intervening decisions of the Supreme Court in *Knowles v. Mirzayance*[3] and *Harrington v. Richter*.[4]  The parties have complied with that Order.

---

[2] Direct testimony was heard on April 15, 2008.  After a delay to resolve funding issues with respect to Geren's retained expert, the hearing was continued to July 14, 2010, and concluded the following day.

[3] 556 U.S. 111 (2009).

[4] 131 S. Ct. 770 (2011).

The facts underlying the crime of which Geren was convicted are well known to the parties, succinctly set forth in the opinion of the California Court of Appeal, and are not relevant to the issue before this Court.  Consequently, they are not repeated here.

## II.  ISSUES PRESENTED/DEFENSES

In his First Amended Petition, Geren contends that, because trial counsel failed to obtain a neurological examination of Geren, he was denied the effective assistance of counsel at trial.  In his Supplemental Brief, Geren, contends that he was denied a fair hearing in the Butte County Superior Court because during the period the evidentiary hearing was pending the court became biased against him due to the costs being incurred.  Respondent asserts no affirmative defense.[5]

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[6]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[7]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

---

[5] Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

[6] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[7] *Williams*, 529 U.S. at 412 (alteration added).

power of the Supreme Court over federal courts.[8]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[9]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[10]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[11]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"[12]  In a

federal habeas proceeding, the standard under which this Court must assess the prejudicial

impact of constitutional error in a state court criminal trial is whether the error had a substantial

and injurious effect or influence in determining the outcome.[13]  Because state court judgments of

---

[8] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[9] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[10] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[11] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[12] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[13] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

conviction and sentence carry a presumption of finality and legality, the petitioner has the burden

of showing by a preponderance of the evidence that he or she merits habeas relief.[14]

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[15]

In applying this standard, this Court reviews the "last reasoned decision" by the state

court.[16] State appellate court decisions that summarily affirm a lower court's opinion without

explanation are presumed to have adopted the reasoning of the lower court.[17] This Court gives

---

[14] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[15] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[16] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[17] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state

the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court.[18]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the superior court files a new original petition for relief in the court of appeal. If denied relief by the court of appeal, the defendant has the option of either filing a new original petition for habeas relief or a petition for review of the court of appeal's denial in the California Supreme Court.[19] This is considered as the functional equivalent of the appeal process.[20] Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[21] This presumption applies to state-trial courts and appellate courts alike.[22]

IV.  DISCUSSION

Geren's trial counsel did not obtain a neurological examination of Geren and withdrew the defense that at the time of the killing Geren had "blacked out" due to a mental defect. Geren argues this action denied him the effective assistance of counsel. Geren initially raised this issue

_____

court explaining the state court's reasoning.").

[18] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[19] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[20] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[21] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[22] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

in his motion for a new trial in the Butte County Superior Court and on direct appeal.  The Butte

County Superior Court rejected Geren's arguments and the California Court of Appeal, after

extensively reviewing the record, affirmed, stating the following:

I. *Effective Assistance of Counsel*

[Geren] contends that, notwithstanding the trial court's denial of [Geren's] motion for a new trial, [Geren] was not afforded effective assistance of counsel at trial.  We disagree.

A criminal defendant has the right to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *People v. Ledesma* (1987) 43 Cal.3d 171, 215, 233 Cal.Rptr. 404, 729 P.2d 839.)  A claim of ineffective assistance of counsel may be made even when counsel is retained rather than appointed, but "the fact that counsel is retained remains an 'important' consideration in measuring the effectiveness of counsel's representation."  (*People v. Frierson* (1979) 25 Cal.3d 142, 161, 162, 158 Cal.Rptr. 281, 599 P.2d 587.)

When a claim for ineffective assistance of counsel is made in a motion for new trial and rejected by the trial court, the appellate court gives great weight to the trial court's decision and defers to the trial court's findings of fact.  (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483, 177 Cal.Rptr. 303.)  Absent a showing of clear and unmistakable abuse of discretion, we will not disturb the trial court's decision. (*Ibid.*)

A. *The Motion for New Trial*

After [Geren's] conviction, the trial court appointed new counsel to represent [Geren] in a motion for new trial, which claimed retained counsel Grady Davis's failure to present evidence of [Geren's] brain damage constituted ineffective assistance of counsel.

At the hearing on the motion for new trial, clinical neuropsychologist Dr. John Wicks testified for the defense.  He said, based upon a review of medical records and administration of psychological tests on [Geren] after trial, that [Geren] had a history of seizures, including full-blown grand mal seizures, and rage-like reactions, dating back 20 years, which led to surgery in 1993 to remove a tumor or cyst from his right temporal lobe.  Dr. Wicks testified [Geren] still showed signs of "mild neuropsychological dysfunction" indicating a "strong possibility that he could be suffering from complex partial seizure or temporal-lobe seizure disorders."  Dr. Wicks said complex partial seizures do not result in a loss of consciousness, but the person having them is "not really there," and has no recollection of his actions. Further evaluation would be needed to determine if [Geren] has temporal lobe seizure disorder that could have triggered a complex partial seizure.  Dr. Wicks opined that tests such as brain electrical activity mapping (BEAM) scan and a positron-emission

tomography (PET) scan should have been conducted during preparation of the defense.

On cross-examination, Dr. Wicks acknowledged that all records in [Geren's] medical files indicated his 1993 brain surgery was successful and he has not suffered any seizures since the surgery. Dr. Wicks was not asked to and did not evaluate [Geren's] conduct at the time of the stabbing. The tests conducted by Dr. Wicks revealed [Geren] did not suffer from severe anxiety, depression, mania, schizophrenic thinking or delusions.

In the hearing on his motion for a new trial, [Geren] testified he was originally represented by appointed counsel, Denny Forland, but switched to retained counsel Grady Davis, for a fee that was to include everything. [Geren] testified he told Davis about his brain injury and surgery, and that his wife hit him on the head and he may have blacked out during the stabbing. Davis said he would have a psychiatrist or psychologist as an expert witness. [Geren] testified he was not evaluated, except in connection with the determination of his competency to stand trial, for which he was interviewed by one doctor (who spent no more than five minutes with him) and by a "Mental Health" person who was not a psychologist or psychiatrist.

[Geren] testified that before the stabbing, he spoke on the telephone to his older son, who was calling about spending the night at a friend's house. [Geren] also spoke with the friend's mother to make sure his son was welcome. [Geren] then planned to clear some roots from ditches on his property. He placed his hunting knife, within its sheath, in his pocket and walked toward his son's bedroom to get a raincoat. His wife blocked his path, reached across him, grabbed the knife by the handle, pulled it out of his pocket, and thrust it at him. He jumped back, grabbed her hand, and struggled with her for control of the knife. [Geren] testified that during the struggle, "I completely lost it," and then, "I completely blacked out." He believed his wife hit him in the head, "because when I came to after that point, I was sitting on the ground and she was laying across my lap facing me."

[Geren] said that "just prior" to his attempt to go clear the dishes, his wife hit him on the head when he took the telephone away from her (because he was afraid she would call the police and their children would again be placed in foster care). She had been trying to provoke an argument since the day before the stabbing. [Geren] said he told all this to his retained counsel before trial and expressed his fear that his wife was going to kill him.

A transcript of [Geren's] post-arrest statement, in which he indicated to peace officers that he did not remember stabbing his wife, was submitted to the trial court in connection with the motion for new trial.

Retained counsel Grady Davis testified he obtained extensive medical records of [Geren]. Davis was aware of [Geren's] past seizures and brain surgery. He was also aware [Geren] was still on seizure medication but was not taking the medication at the time of the killing. He considered having [Geren] evaluated by a psychologist or psychiatrist but felt it unnecessary after talking to [Geren] and [Geren's] doctors and reviewing the records. Davis said he believed that, in order to present a credible

mental defense that [Geren] suffered a seizure at the time of the stabbing, [Geren] would have to testify. Davis was concerned such a defense would have been inconsistent with [Geren's] statements to the 911 dispatcher (acknowledging awareness of stabbing his wife) and [Geren's] statements to detectives after his arrest (in which he said his wife attacked him as he came in through the back door, and he vaguely remembered having the knife, and the next thing he knew she was cut). Accordingly, after the prosecution rested its case in chief without introducing [Geren's] post-arrest statements, Davis decided to keep [Geren] off the witness stand and argue voluntary manslaughter based on the 911 tape and statements of the child who said his mother had the knife and then his parents struggled over the knife.

Davis testified he saw problems with a mental defense. [Geren] was on medication for anger control and depression, not seizures, and one of [Geren's] doctors—Dr. Randall Caviness (with concurrence of two other doctors)—said it would be difficult to demonstrate any effects from the surgery which had cured the seizure disorder. Additionally, Davis felt [Geren's] doctors did not view him favorably because he often failed to take his medication because it diminished his sexual pleasure. Counsel also felt, based on his 20 years practicing criminal law, that [Geren] would not be a sympathetic witness, partly because he was argumentative. Counsel was aware of other witnesses who were "eager" to testify as rebuttal witnesses against [Geren] if he took the stand. Davis said he made a tactical decision on how best to defend [Geren].

Davis said that when he referred to the brain surgery in opening statement, he thought it might come out in evidence and would garner sympathy for [Geren], regardless of whether a mental defense was presented. Davis said he engaged in some "gamesmanship" and tried to distract the prosecution by suggesting he was planning a mental defense.

Defense investigator James Pihl testified he interviewed two of [Geren's] doctors before trial and concluded they would not be helpful to the defense. Dr. Caviness, who treated [Geren] in late 1998, saw no reason to believe [Geren] had blacked out during the incident. Pihl also spoke to [Geren's] current psychiatrist, Dr. Tin Shain, who could not substantiate or back up a theory that [Geren] suffered a blackout before the stabbing. Pihl also spoke with Dr. John Wilson, who was used as an expert witness by retained counsel in a different case, but Wilson offered no support for a blackout defense. Pihl passed all this information on to retained counsel before trial.

In April 2002, the trial court denied [Geren's] motion for new trial, concluding retained counsel was not incompetent for failing to raise a mental defense. The trial court said that, even if some evidence existed to support such a defense, retained counsel believed [Geren] himself would have had to testify because the prosecution's case contained no evidence of a blackout. If [Geren] had testified, he would have been impeached by the inconsistent evidence of his statements to the 911 dispatcher and his post-arrest statements to detectives. The main issue would have been [Geren's] credibility. The trial court concluded retained counsel made an informed tactical decision not to call [Geren] as a witness and to pursue instead a

defense of heat of passion and/or imperfect self-defense, which found some support in the 911 tape and the child witness's statements to investigators.

B.  *Analysis*

A claim of ineffective assistance of counsel calls for [Geren] to demonstrate (1) counsel's performance was deficient; and (2) prejudice resulted from the deficient performance.  (*Strickland v. Washington, supra,* 466 U.S. at pp. 687, 693; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216-217, 233 Cal.Rptr. 404, 729 P.2d 839.)  Relief is granted only if both questions are answered affirmatively.  (*Ibid.*)  To establish deficiency of performance, [Geren] must show trial counsel "failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People v. Pope* (1979) 23 Cal.3d 412, 425, 152 Cal.Rptr. 732, 590 P.2d 859.)  If the record contains an explanation for counsel's conduct, the court must determine whether the record demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate.  (*Ibid.*)  A criminal conviction will be reversed on grounds of ineffective assistance of counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.  (*People v. Zapien* (1993) 4 Cal.4th 929, 980, 17 Cal.Rptr.2d 122, 846 P.2d 704.)

"In order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense.  [Citations.]"  (*In re Neely* (1993) 6 Cal.4th 901, 919, 26 Cal.Rptr.2d 203, 864 P.2d 474.)

[Geren] argues his case "cried out for a neuropsychological examination." [Geren] says the reason Davis did not pursue such an examination was because Davis did not want to pay for it out of Davis's own retainer (which consisted of $5,000 cash plus equity in [Geren's] property).  [Geren] also claims Davis made inconsistent representations because (1) in the hearing on the motion for new trial Davis said he had no reason to think [Geren] had any mental defect, yet (2) Davis asked the trial court for a section 1368 evaluation, citing in part [Geren's] brain surgery, medications, current headaches, dizziness, and recurrence of seizures.

However, [Geren] fails to show any abuse of discretion in the trial court's determination of these issues.  Davis testified the retainer he received from [Geren] included all costs, including expenses for experts.  Davis also said there was "always a cost factor analysis that goes into any type of activity that you're performing as a lawyer," but "if I thought it was appropriate, I very well might have gone, come to this Court and asked for funds.  But . . . there's no way I would have neglected to investigate or seek expert help simply because of money."

Moreover, as we have recounted, the evidence adduced at the hearing on the motion for new trial showed Davis was not required to obtain a neuropsychological examination.  Nothing in [Geren's] medical records indicated [Geren] suffered seizures after the surgery in 1993.  [Geren's] own doctors offered no help with a defense based on mental defect.  Two mental health experts concluded [Geren] was

competent to stand trial in November 2000 (nine months after the February 2000 killing). Although there was evidence that [Geren] had anger management problems even after the surgery, and had been diagnosed with a personality disorder in 1999, there was nothing suggesting a recurrence of seizures to support [Geren's] "blackout" claim.

Moreover, a claim that [Geren] blacked out during the stabbing would have been inconsistent with [Geren's] statements during the 911 telephone call immediately after the stabbing, in which [Geren] reported what had happened (that he grabbed the knife from his wife and used it on her). In the 911 call, he did not profess ignorance or confusion as to what happened, nor did he claim he blacked out.

There is nothing inconsistent in Davis's decision not to present a mental defect defense after requesting a section 1368 evaluation in October 2000. [Geren] says Davis told the court that [Geren] was having seizures. However, that does not mean [Geren] was actually having seizures (as opposed to merely reporting seizures). Davis did not say he witnessed any seizures. He merely indicated he observed [Geren] having difficulty thinking and comprehending.

Because nothing in [Geren's] medical history or recent examinations indicated he still suffered from seizures at the time he stabbed his wife, Davis had no reason to order a neurological evaluation to try to show [Geren] was unconscious at the time of the stabbing. [Geren] suggests a neurological examination was critical to the manslaughter theory presented at trial, because he weighed twice as much as his wife. He cites authority concerning admissibility of evidence of mental defect. (§ 28 [evidence of mental defect is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought]; *People v. Coddington* (2000) 23 Cal.4th 529, 582-583, 97 Cal.Rptr.2d 528, 2 P.3d 1081, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, 108 Cal.Rptr.2d 409, 25 P.3d 618.) However, [Geren] fails to tie this argument to a showing that defense counsel's failure to obtain a neurological examination resulted in ineffective assistance of counsel.

[Geren] cites evidence of his 1993 brain surgery, his subsequent sleep apnea and "rage attacks," and a 1999 diagnosis of organic personality disorder (in connection with a Department of Social Services evaluation of a disability application). [Geren] says that, in addition to this history of seizure disorders, [Geren] stated after his arrest that he had blacked out. However, [Geren's] medical records do not reflect seizures after the brain surgery.

[Geren] cites *People v. Beeler* (1995) 9 Cal.4th 953, 39 Cal.Rptr.2d 607, 891 P.2d 153 (*Beeler* ), as support for his argument the pretrial investigation should have included a neurological examination. However, *Beeler, supra,* 9 Cal.4th 953, 39 Cal.Rptr.2d 607, 891 P.2d 153, held the record did not support the defendant's contention that trial evidence should have caused his attorney to seek neurological testing, even though there was evidence of a long history of mental health problems and two psychologists testified the defendant suffered from disassociation (memory loss or unawareness of actions). (*Id.* at pp. 1007-1008, 39 Cal.Rptr.2d 607, 891 P.2d

153.)  The Supreme Court said nothing in the record supported a conclusion that evidence of memory loss and disassociation should have alerted counsel to a need for neurological testing for organic brain damage, nor did the defendant's own psychologists testify such testing was needed.  (*Ibid.*)

In his reply brief, [Geren] argues *Beeler, supra,* 9 Cal.4th 953, 39 Cal.Rptr.2d 607, 891 P.2d 153, is distinguishable, because here there was additional evidence, in that Davis was aware [Geren] told the detectives that he had blacked out.  However, this additional evidence did not compel counsel to obtain a neuropsychological evaluation.

That two experts concluded [Geren] was competent to stand trial further supports the People's position.  *In re Scott* (2003) 29 Cal.4th 783, 129 Cal.Rptr.2d 605, 61 P.3d 402 (*Scott* ), cited section 1368 reports as relevant to the question whether defense counsel should have investigated and presented a mental defense at trial.  (*Id.* at p. 825.)  *Scott* concluded that, even if counsel should have investigated further, there was no prejudice in the failure to do so.  (*Ibid.*)

[Geren] here points out *Scott, supra,* 29 Cal.4th 783, 129 Cal.Rptr.2d 605, 61 P.3d 402, is distinguishable because there the section 1368 evaluation was performed a mere two months after the crime.  (*Id.* at p. 825, 129 Cal.Rptr.2d 605, 61 P.3d 402.)  Here, there was a nine month lapse.  We do not consider the difference significant.

[Geren] says Davis admitted his failure to obtain a neuropsychological evaluation amounted to abandonment of a potential defense.  However, Davis said he did not think it was a potentially meritorious defense.  Moreover, Davis noted the risk of putting [Geren] on the stand, which he believed would be necessary for a mental defect defense.  *People v. Jackson* (1980) 28 Cal.3d 264, 168 Cal.Rptr. 603, 618 P.2d 149 (disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, 103 Cal.Rptr.2d 23, 15 P.3d 243), said counsel was not unreasonable for failing to pursue a diminished capacity defense where, among other reasons, counsel concluded the defense would have required testimony from the defendant personally, exposing him to intense and perhaps damaging cross-examination and would have provoked a negative reaction from the jurors.  (*People v. Jackson, supra,* 28 Cal.3d at p. 290, 168 Cal.Rptr. 603, 618 P.2d 149.)

[Geren] argues Davis's comments at the start of trial show he was expecting to call [Geren] as a witness.  However, assuming that to be the case, it does not undercut Davis's stated decision not to subject [Geren] to cross-examination on a questionable defense that would have been inconsistent with [Geren's] own statements to the 911 dispatcher.

[Geren] cites *People v. Frierson, supra,* 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587 (*Frierson*), as holding the failure to take reasonable investigative measures by obtaining a neuropsychological examination constituted ineffective assistance of counsel.  However, in *Frierson,* two witnesses testified that the defendant had taken Quaalude and angel dust and appeared "'spaced out'" on the day of the murder.  (*Id.* at p. 159, 158 Cal.Rptr. 281, 599 P.2d 587.)  Although defense counsel raised a diminished capacity defense, he failed to arrange for any medical experts to testify in support of that theory.  (*Id.* at pp. 159, 163-164, 158 Cal.Rptr.

281, 599 P.2d 587.) The Supreme Court held counsel rendered ineffective assistance but said: "We should not be understood as requiring that trial counsel must seek psychiatric or expert advice in every case wherein drug intoxication is a possible defense.  Yet in a capital case, where diminished capacity appears to be the *sole* potentially meritorious defense, and counsel has in fact elected to present such a defense at trial, counsel must be expected to take those reasonable measures to investigate the factual framework underlying the defense preliminary to the exercise of an informed choice among the available tactical options, if any.  In the present case, we need not speculate as to the likely prejudicial effect of counsel's omissions, for counsel's failure to take reasonable investigate measures actually resulted in the presentation to the jury of an incomplete, undeveloped diminished capacity defense. We conclude that defendant was thereby deprived of his right to effective trial counsel." (*Id.* at p. 164, 158 Cal.Rptr. 281, 599 P.2d 587.)

Here, in contrast, Davis did not offer any evidence supporting a blackout defense because he made an informed tactical decision not to present such a defense. Instead, he put forward an alternative defense that was more consistent with the evidence and did not require [Geren] to testify.  Thus, *Frierson, supra,* 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587, does not help [Geren] in this case.

[Geren] complains Davis's investigator did not contact [Geren's] treating doctors until a week before trial.  However, he fails to show how this provides a basis for reversal of the judgment.

[Geren] in his reply brief argues Davis did not make an informed decision not to present a blackout defense, because according to [Geren], "It was Davis' position that he did not even recall from the post arrest interview anything about a blackout." However, the page of the reporter's transcript cited by [Geren] shows the following:

"Q.  Do you recall [defendant] making a statement to Detective Kiefer about a blackout?

"A.  I recall watching the video tape and having [defendant]—I remember something along those lines.

"Q.  Okay. Do you recall when he talked about the blackouts?

"A.  No.

"Q.  Do you recall it being after he took the knife from Tammi [footnote omitted] and he woke up and saw Tammi laying on top of him?

"A.  I remember something like that."

Thus, [Geren's] reply brief misstates the record.

We conclude Davis's performance was not deficient.

Furthermore, [Geren] fails to establish any prejudice from counsel's actions. [Geren] relies on Dr. Wicks's recommendation that [Geren] be examined by a forensic neuropsychiatrist.  However, [Geren] fails to show that such examination would have supported a mental defect defense.  Although [Geren] claims Wicks opined [Geren] had a type of seizure disorder, the cited page of testimony does not contain any testimony about [Geren] having a seizure disorder after his surgery.

Contrary to [Geren's] argument, the fact that Davis's pre-trial decisions precluded [Geren] from raising a blackout defense does not constitute prejudice.

13

Prejudice may be presumed only when defense counsel wholly fails to investigate a potentially meritorious defense, and as a result the defense is withdrawn or counsel is incapable of making an informed tactical decision whether the defense should be offered. (*People v. Williams* (1988) 44 Cal.3d 883, 943, 245 Cal.Rptr. 336, 751 P.2d 395.) Here, counsel did investigate and made an informed tactical decision.

At the end of his argument concerning ineffective assistance of counsel, [Geren] argues the trial court's findings, in ruling on the motion for new trial, are not supported by substantial evidence. However, as we stated *ante,* when a claim for ineffective assistance of counsel is made in a motion for new trial and rejected by the trial court, the appellate court gives great weight to the trial court's decision and defers to the trial court's findings of fact. (*People v. Wallin, supra,* 124 Cal.App.3d 479, 483, 177 Cal.Rptr. 303.) Absent a showing of clear and unmistakable abuse of discretion, we will not disturb the trial court's decision. (*Ibid.*) [Geren] has failed to show any abuse of discretion. He says Davis's concern about putting [Geren] on the witness stand was not a reason for Davis's omission of a neurological evaluation because, until the prosecution rested, Davis was still considering having [Geren] testify. However, the cited page of the reporter's transcript merely shows Davis said he made his recommendation to [Geren] that [Geren] not testify, "[P]robably at the end of the prosecution's case." Moreover, even assuming that up until that point Davis was still considering putting [Geren] on the stand, that would not detract from Davis's concern about putting [Geren] on the stand to testify about a mental defect defense that was inconsistent with other evidence.

Insofar as [Geren] challenges the conclusion of the trial court that a blackout defense would have required [Geren] to testify, he fails to show abuse of discretion. [Geren] claims the blackout defense could have been presented without his testimony, by having an expert witness use [Geren's] post-arrest statement to the law enforcement officers. However, as observed by the Attorney General, the issue is not whether Davis could have found a way to make the jury aware that [Geren] told officers he blacked out, but whether such an approach would have provided enough evidence to present a credible mental defense. Given the inconsistencies between [Geren's] statements to the 911 dispatcher and his subsequent statement to detectives, a reasonable attorney could conclude [Geren] needed to testify.

We conclude that abundant evidence supports the trial court's ruling that trial counsel made a reasonable, informed tactical decision not to present a "blackout" defense; [Geren] fails to show any basis for reversal of the judgment based on ineffective assistance of counsel.[23]

---

[23] *People v. Geren*, No. C041543, 2004 WL 187570, at *4-11 (Cal. Ct. App. Jan. 30, 2004).

After holding the evidentiary hearing ordered by the California Supreme Court, the Butte County Superior Court denied Geren relief, holding:

> The issues before this court may be stated as follows:
>
> a.  Does the evidence presented at the evidentiary hearing i.e. the testimony of Dr. Jeff Victoroff, coupled with all previous evidence presented at the Motion for New Trial now show that [Geren] was deprived of effective assistance of counsel?
>
> b.  Stated in a different way:  Does the testimony of Dr. Victoroff raise sufficient "new facts" to show that the basis for the prior ruling on the Motion for New Trial and subsequent affirmation by the Court of Appeal is now different and therefore ineffective assistance of counsel occurred and was indeed prejudicial.
>
> The facts of the crime and circumstances surrounding the representation of defense counsel Grady Davis, Esq. are succinctly set forth in the opinion of the Court of Appeal filed January 30,2004 and will not be recited again here.
>
> After the trial court denied the Motion for New Trial and the Court of Appeal affirmed, a petition for review was filed in the California Supreme Court and was denied on April 14, 2004. On June 9, 2003 a Petition for a Writ of Habeas Corpus was filed in this court and denied.  On September 15, 2003 a similar petition was filed in the Court of Appeal and denied.
>
> On July 5, 2005 a Petition for a Writ of Habeas Corpus was filed in the US District Court for Eastern California.
>
> On July 30, 2007 the Federal Court directed that the federal proceedings be stayed and that a petition be filed in the state Supreme Court. That stay is still in effect.
>
> ### THE MOTION FOR NEW TRIAL
>
> At the Motion for New Trial a psychologist, Dr. John Wicks, PhD, testified that Mr. Geren had a medical history of rage-like reactions due to a pre-existing organic brain pathology.  E.g. temporal lobe seizure-complex partial seizures.
>
> He opined that the crime was committed during a rage-type. reaction.
>
> Mr. Geren testified at the Motion for New Trial.  He stated that he had "blacked out" after taking the knife from the victim.  This "blackout" evidence was not presented during the jury trial as Mr. Geren exercised his Fifth Amendment privilege not to testify.  The prosecution presented no 'blackout' evidence.
>
> Mr. Davis testified that he did not pursue the medical defense, in part, because in order to satisfactorily prove it to the jury Mr. Geren would have to testify and that if he did testify Mr. Geren could be impeached.  He also testified that Mr. Geren told him that he had lost control and "stabbed her repeatedly" (R.T p. 1504).
>
> The trial court found that Mr. Davis made a reasonable tactical decision not to present medical testimony because Mr. Geren would have to testify about the circumstance of the "blackout" to lay a foundation for medical opinion on diminished capacity.

## DR. JEFF VICTOROFF'S TESTIMONY

Dr. Victoroff, MD is board certified in both neurology and psychiatry. His credentials are lengthy and impressive. They are set forth at length in his declaration attached as Exhibit "A" to the Petition for Habeas Corpus filed in the California Supreme Court on January 9, 2007. Those impressive credentials will not be repeated here.

He was the only witness at the evidentiary hearing. The respondent presented no expert.

Dr. Victoroff's opinion is that Mr. Geren was, because of his previous temporal lobectomy and other pre-existing medical conditions, susceptible to sudden uncontrolled violent impulses. He described this diagnosis of Mr. Geren as an "Intermittent Explosive Disorder."

While a lay person might describe the symptoms as a "blackout", [sic] in Dr. Victoroff's opinion the uncontrolled impulse is akin to an unconscious reaction which can be violent and which the patient simply cannot remember.

In forming his opinions Dr. Victoroff read voluminous medical records, the transcript of Mr. Geren's testimony at the Motion for New Trial and various radiologic studies including post-conviction MRI scans.

He also reviewed police reports, viewed a video tape of a police interview of Mr. Geren and an interview of his seven year old son.

Additionally he interviewed Mr. Geren at San Quentin prison in 2006 and 2007.

He reviewed hundreds of medical journal articles and testified about some of them at the hearing.

He testified that he gave small credence to Mr. Geren's statements to him at the prison and formed his opinion mostly on his knowledge, research, and review of the records. He did remember during the prison interview Mr. Geren physically demonstrated stabbing motions which Dr. Victoroff considered as an example of an impulsive act.

## SUMMARY OF EXPERT TESTIMONY

The rage-like reaction described by Dr. Wicks in 2002, has a similar if not the same symptoms of an Intermittent Explosive Disorder as described by Dr. Victoroff in 2010. The two different disciplines appear to the court to be describing the same thing with different medical terminology and etiology.

The basic gist of their opinions, viewed most favorably to the argument that Mr. Davis should have pursued a medical defense of diminished capacity, is that Mr. Geren had a pre-existing medical condition which was triggered during the crime and which made him incapable of forming a specific intent to or premeditate the killing of his wife.

From the testimony presented at the Motion for New Trial and at this hearing the court finds that medical opinion existed which, if discovered, might have been used to present a possible defense to the crime of murder.

16

ANALYSIS

**A.** Should Mr. Davis have pursued that medical opinion and presented it to the jury and was he ineffective as counsel in failing to do so?

This court is mindful of the legal precedent set forth by the U.S. Supreme Court in Strickland v. Washington 466 US 668 (1984).

As stated at p 690:

"Thus, a court deciding an actual ineffectiveness of counsel claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."

"In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments". At p 691

Therefore in judging Mr. Davis' conduct this court will focus on the facts as they existed in 2001. In some ways this is difficult since Dr. Victoroff's testimony was given in 2008 and 2010. However, the court, as stated above, finds that medical opinion was existent in 2001 which if pursued might possibly have been used by defense counsel.

This of course begs the ultimate question of why didn't Mr. Davis pursue it and if he did not was that decision unreasonable.

This question was decided once before by this court in the Motion for New Trial and affirmed on appeal in 2002 and 2004.

Now six years later in this Petition for a Writ of Habeas Corpus this court is asked again to visit the issue.

Here again guidance is received from the U.S. Supreme Court

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight; to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland at p. 889

Nothing in Dr. Victoroff's enlightening testimony addressed to a satisfactory way the thought process of Mr. Davis or the tactical reasoning he used in deciding not to pursue further a medical defense,

If Dr. Victoroff's opinions had existed in 2001 and had they been known by Mr. Davis, it is easy to say that he would have been required to pursue the defense.

Those opinions were not known to him. So we ask – was he required to go look for them?

Again that question was previously answered in this case and the answer was no. Not under the circumstances as existed <u>at the time</u> and from counsel's perspective <u>at the time</u> (emphasis added).

17

Mr. Davis subpoenaed and reviewed extensive medical records and had his investigator interview Mr. Geren's treating physicians including specialists.

These professionals were available to Mr. Davis as expert witnesses; however, none of their opinions were similar to those expressed by Dr. Victoroff. Mr. Davis also knew of unfavorable credibility problems with his client's testimony and chose not to further pursue additional medical evidence.

While an expert witness could testify and give a medical opinion based on facts gleaned from the medical records and police reports, a jury would be told not to assume the underlying facts were true but only to show the basis for that medical opinion.

Trial counsel could therefore reasonably conclude that Mr. Geren would have to testify to actually prove such facts to the jury,

And if he testified his credibility would be an important issue. Mr. Geren's differing versions of what happened and the existence of what was described as "a wealth of impeachment" (rt. [*sic*] p 1512) could easily make his testimony suspect.

Mr. Geren exercised his Fifth Amendment privilege and did not testify. The court finds that Mr. Davis made a reasonable tactical decision not to pursue further a medical defense.

**B.** Has [Geren] proved prejudice as a result of Mr. Davis' failure to present that medical opinion?

After a jury had found him guilty of murder, Mr. Geren waived his Fifth Amendment privilege and testified at the Motion for New Trial. The trial court was not persuaded by that testimony and denied the motion. On the contrary, the trial court found significant differences between the testimony and Mr. Geren's pre-trial statements. Whether a jury might also recognize those differences and question Mr. Geren's credibility is an unknown.

Another unknown is what weight, if any, a jury would give to the proposed medical opinion proffered by petitioner. It is unknown which medical expert Mr. Davis might have used. The likelihood of him discovering Dr. Victoroff out of the thousands of such professionals in practice at the time of trial is questionable.

However, even if Dr. Victoroff had been found by Mr. Davis, based on the doctor's refusal to testify at this hearing until pecuniary issues were resolved, it is speculation to assume he would have been a defense witness in 2001. (The court notes the extraordinary efforts made by [Geren's] current counsel to procure his appearance).

But, regardless of which medical expert Mr. Davis would have used and assuming that expert's opinion coincided with those of Dr. Wicks or Dr. Victoroff, the question remains as to how that opinion would have been received by the jury. Would it have raised a reasonable doubt?

This court cannot speculate. It might have or it might not have.

The evidence presented at the hearing does not answer that question.

The opinions of Dr. Victoroff, standing alone, show a possible defense to murder.

18

Do those opinions in light of all the other facts and circumstances of the case show a reasonable probability of a different result?  That is the standard this court must use.  <u>Strickland</u> at p. 694.

This court cannot find that [Geren] has proved prejudice to that required standard.  A mere possibility of a different result is not enough.  There must exist a reasonable probability of a different result.

### RULING

The petition for Writ of Habeas Corpus is denied.[24]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Geren must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[25]  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment."[26]  Geren must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[27]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair

---

[24] *California v. Garen*, No. S149331, CM013568; Docket No. 67, at 42-49.

[25] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[26] *Id*.

[27] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985) (citing *Strickland,* 466 U.S. at 694).

or unreliable, is defective."[28]   An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[29]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[30]  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.[31]

---

[28] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[29] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[30] *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

[31] 466 U.S. at 689 (internal citations and quotation marks omitted).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[32]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[33]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard. Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[34]

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[35]

---

[32] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

[33] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[34] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[35] *Id.* at 786.

While judicial inquiry into counsel's performance under *Strickland* must be highly deferential, it is "by no means insurmountable," but nonetheless remains "highly demanding."[36] "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."[37] "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial."[38]

Geren bears the burden of proving that counsel's trial strategy was deficient. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[39] "[Geren] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."[40] "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound trial strategy."[41] "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[42]

---

[36] *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[37] *Richter*, 131 S. Ct. at 791 (internal quotation marks and citation omitted).

[38] *Morrison*, 477 at 382.

[39] *Strickland*, 466 U.S. at 689 (citation omitted).

[40] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689).

[41] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[42] *Strickland*, 466 U.S. at 681 (citation omitted).

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[43]  The court must then consider those acts or omissions against "prevailing professional norms."[44]  Even then, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[45]

While "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," an attorney's strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[46]  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[47]  The Supreme Court has never, however, explained what amount of investigation is sufficient.  "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[48]  The question is not "what is prudent or appropriate, but only what is constitutionally compelled."[49]

---

[43] *Id*. at 690.

[44] *Id*. at 688, 690.

[45] *Id*. at 690.

[46] *Id.* at 690-91.

[47] *Id*.

[48] *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

[49] *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)).

Geren argues there was no informed, tactical decision by trial counsel not to investigate the effects of the removal of Geren's right temporal lobe.  More specifically, Geren argues:

> Assuming Mr. Davis read Mr. Geren's medical records, he must have known that Mr. Geren's right temporal lobe had been surgically removed in 1994 at U.C.L.A.  At that point he had a duty to inquire of any competent expert as to what that mean in a prosecution for pre-meditated murder.  Grady Davis may qualify as a licensed attorney, but he clearly did not understand what effect the removal of Mr. Geren's right temporal lobe had on his subsequent behavior, nor did he know enough to even ask the question of any expert.[50]

Properly framed, the issue is:  given the information available to counsel at the time of Geren's trial in 2001, did the failure of Geren's counsel to subject Geren to a neurological examination constitute ineffective assistance of counsel?  The record is clear that Geren's counsel did conduct some investigation into the effect removal of Geren's right temporal lobe had on Geren's behavior.  The issue turns on whether, under all the facts and circumstances, this investigation was sufficient or should counsel have gone further and consulted an expert such as Dr. Victoroff?  To paraphrase Geren's argument, given counsel's lack of a sufficient understanding of the effect removal of part of the brain has on behavior, should Geren's counsel have sought out and obtained the opinion of an expert such as Dr. Victoroff?

As the Butte County Superior Court found, Dr. Victoroff's testimony established that medical opinion existed that, if pursued, might possibly have been used in Geren's defense.  But the question is not whether a viable defense may have existed, it is whether trial counsel was ineffective for failing to discover and present that defense.  What Dr. Victoroff's testimony does not establish, indeed could not, is that Geren's trial counsel was ineffective for not pursuing that avenue.  Dr. Victoroff's testimony is not evidence indicating that counsel was unreasonable or

---

[50] Docket No. 71, at 9.

ineffective for failing to obtain a neurological examination.  Geren presented no alternate

attorney's determination challenging trial counsel's decision not to obtain a neuropsychological

examination.

Dr. Victoroff's testimony itself seriously undercuts Geren's position.  Dr. Victoroff

diagnosed Geren with organic based intermittent explosive disorder ("IED"), an episode of which

causes a person to experience a seizure-like outburst of violent activity during which, because

that part of the brain that functions as a "brake" on abnormal aggressive reactions is missing, he

is unable to control his actions, deliberate, or weigh or consider alternatives.[51]  According to Dr.

Victoroff, an IED episode typically last three to five minutes, followed by an inability to

remember details of the incident.[52]  In Dr. Victoroff's opinion, Geren was suffering an IED

episode when he stabbed his wife.

> Q.    (By Ms. Hilberg)  Well, in your medical opinion, what is the totality
> of all these factors we've been discussing all afternoon on the events of February
> 13th, 2000.
> A.    My understanding is that when Mr. Geren grabbed a knife and stabbed
> his wife, he was almost completely incapable of formulating a plan at that moment
> for those few seconds because his already grossly abnormal brain was further
> disrupted by medication side effects.  Possibly as well by alcohol, I don't know.
> He had a very severely impair capacity for forethought.  As he had before and
> continues to do, he acted impulsively with a tragic neurologically based incapacity
> to consider the consequences until it was too late.[53]

Dr. Victoroff also testified that none of the doctors who treated Geren in the years before

his trial diagnosed him with organic based IED.[54]  He further testified that most psychiatrists

---

[51] Lodged Doc. No. 9, at 76, 169-71; Lodged Doc. No. 10, at 123-29.

[52] Lodged Doc. No. 9, at 173-75; Lodged Doc. No. 10, at 130, 135-36.

[53] Lodged Doc. No. 9, at 106-07.

[54] Lodged Doc. No. 11, at 347, 349, 353, 357.

would not have diagnosed Geren with IED or impulse control disorder, in part because at the time the Diagnostic and Statistical Manual (DSM-IV) did not provide for such a diagnosis when a person had organic brain damage; a diagnosis of IED would, however, be made by a competent behavioral neurologist or neuropsychiatrist.[55]  Dr. Victoroff also testified that the psychiatrist who examined Geren in 1995 was "incompetent" in failing to do what Dr. Victoroff would do to rule out IED,[56] and the neuropsychologist who testified at the motion for a new trial, was not an appropriate expert to evaluate Geren.[57]

Were this a case of medical malpractice instead of ineffective assistance of counsel, Dr. Victoroff's testimony might be sufficient to find that the failure of Geren's physicians to diagnose him with IED constituted negligence.  The fatal deficiency in Geren's position is that there is nothing in the record that would indicate to an attorney that Geren suffered from organic based IED.  No licensed physician provided Geren's trial counsel with any indication that, at the time Geren stabbed his wife, he was unable to control his reaction or that he suffered with any mental defect that affected his ability to formulate the intent necessary to satisfy the California requirement for a first-degree murder conviction, or that a neurological examination was needed. In short, nothing in the information available to trial counsel indicated a need for a neurological examination.  An attorney can hardly be faulted for failing to have sufficient knowledge to detect the possible existence of a mental defect, not only undetected by licensed medical professionals who treated or examined Geren but, according to the testimony of Geren's own expert, unlikely

---

[55] Lodged Doc. No. 9, at 70-71, 77; Lodged Doc. 10, at 167; Lodged Doc. 11, at 319-20, 339-40, 343.

[56] Lodged Doc. No. 11, at 344.

[57] Lodged Doc. No. 10, at 179-80.

to have been detected and diagnosed by them.  It is further complicated by another factor noted by the Butte County Superior Court—could counsel have found an expert to testify as did Dr. Victoroff?[58]  Dr. Victoroff's testimony established that not just any neurologist or psychiatrist would do, it had to be a behavioral neurologist or neuropsychiatrist.  Dr. Victoroff also testified that behavioral neurologist are a small subset of neurologists and that only approximately twenty percent of psychiatrists are neuropsychiatrists.[59]  Dr. Victoroff also acknowledged that the definition of a neuropsychiatrist has varied over the years, was controversial, and their capacity to do the kind of assessment Dr. Victoroff did varied.[60]  This is not a case in which Geren's defense counsel failed to act in the face of powerful evidence of a defense that would have been apparent from any of the documents counsel had or could reasonably have obtained.[61]  To accept Geren's argument would require a court to find that a reasonably competent attorney would, based upon the facts known to Geren's trial counsel, that not only was a neurological examination required, but that it would have to be conducted by a subspecialist.  This Court cannot state that a contrary determination was objectively unreasonable.

Geren also argues that his testimony would not be necessary.  Starkly lacking is any analysis of the law for this conclusion, i.e., under what principle of California law would have allowed counsel to present the defense of IED to the jury without the testimony of Geren.  Prior to the time that Geren committed the offense in this case, California had abolished the general

---

[58] Dr. Victoroff described himself as a "behavioral neurologist neuropsychiatrist." Lodged Doc. No. 10, at 186.

[59] Lodged Doc. No. 11, at 340, 344.

[60] Lodged Doc. No. 11, at 344.

[61] *Bobby v. Van Hook*, 130 S. Ct. 13, 19 (2009).

defenses of diminished capacity, diminished responsibility, and irresistible impulse.[62]  The jury may, however, consider evidence of mental impairment and its effect upon a defendant's ability to form any mental state required for the offense charged.[63]  Under then extant California law, to establish voluntary manslaughter instead of murder,[64] a criminal defendant had to unintentionally kill another:  (1) in a sudden quarrel or heat of passion;[65] or (2) have an unreasonable but good faith belief in the need to act in self-defense ("imperfect self-defense").[66]  As Respondent correctly notes, while Dr. Victoroff could have competently testified to his opinion that IED, a form of mental defect that could lead to the impulsive behavior, the *vel non* of the mental states of premeditation and deliberation, he could not have competently testified that Geren actually harbored such a mental state.[67]  Geren would have had to testify as to the events preceding and during the act of stabbing his wife to establish the factual basis for application of the IED defense.  It cannot be denied that in order for trial counsel to establish either of these alternatives, Geren would have been required to testify, thus subjecting himself to potentially damaging cross-examination and possible impeachment for his inconsistent statements, and trial counsel's understanding of this cannot be described as unreasonable or unrealistic.

---

[62] *See In re Christian S.*, 872 P.2d 574, 577, 581-82 (Cal. 1994) (discussing the effect of the 1981 amendments to California Penal Code §§ 25, 28, 29).

[63] Cal. Penal Code § 28; *People v. Viscotti*, 825 P.2d 388, 418-19 (Cal. 1992).

[64] Geren does not suggest that the testimony of Dr. Victoroff would be sufficient to warrant acquittal, only that it would support a finding of a lesser offense—manslaughter.

[65] *People v. Lasko*, 999 P.2d 666, 671 (Cal. 2000).

[66] *People v. Blakely*, 999 P.2d 675, 676-77 (Cal. 2000).

[67] *People v. Coddington*, 2 P.3d 1081, 1127 (Cal. 2000), *disapproved on other grounds by Price v. Superior Court*, 25 P.3d 618, 532 n.13 (Cal. 2001).

Finally, Geren argues that trial counsel's actual motivation was financial, i.e., that he did

not want to use any of his fees to pay for an independent neurological examination. The Butte

County Superior Court specifically addressed this contention in Geren's motion for a new trial

and rejected it. Implicit in that reflection is that the court accepted counsel's testimony that

financial considerations were not determinative of his decision. This Court is bound by that

determination unless it is overcome by clear and convincing evidence.[68]  Geren has not met that

burden.

Based upon the foregoing, this Court cannot unequivocally hold on the record before it

that the determination by the California Court of Appeal and the Butte County Superior Court

that Geren's trial counsel did not fail to make a reasonable investigation, or that after the

investigation trial counsel made a reasonable tactical decision that was not objectively

unreasonable. Thus, Geren has failed to establish the first prong of the *Strickland* test.

Geren has also failed to establish the second prong—prejudice. As the Butte County

Superior Court noted, that counsel's errors had some conceivable effect, i.e., a mere possibility,

of a different result is not sufficient,[69] there must be a probability of a different result, i.e., a

probability sufficient to undermine confidence in the outcome.[70]  In his declaration appended to

the Amended Petition, Dr. Victoroff succinctly summarized Geren's condition:

> To a reasonable degree of medical certainty, Mr. Geren committed the index
> offense because he has a grossly abnormal brain missing a substantial amount of
> tissue and a typical—and typically tragic—impulse control disorder of the type well-
> known to occur with this type of brain disorder. This superordinate organic brain

---

[68] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[69] *Strickland v. Washington*, 466 U.S. 668, 693 (1984).

[70] *Id.* at 695.

problem may have been compounded to some degree by multiple other forms of brain damage. At the critical time of the confrontation with his wife, he was additionally impaired by antidepressant withdrawal syndrome and by volitional alcohol use. This tragic mix of circumstances led him to act in a sudden, thoughtless, highly aggressive way, with little or no provocation. The natural consequences of stabbing someone with a knife are obviously dangerous to human life. But Mr. Geren's action was not based on normal brain function. His brain disorders seriously impaired his ability to form deliberated intentions. In so far as we can reconstruct the momentary mental state of a person with so many types of brain damage in the midst of an episode of IED, Mr. Geren was probably acting not with "conscious disregard for human life" but with significantly impaired consciousness regarding what he was doing and the fatal impact it might have on his wife due to a very well documented major organic brain disorder.[71]

Geren argues that had this information been given to the jury, there is a reasonable probability that he would have been convicted of a much lesser offense than premeditated first-degree murder. This Court disagrees.

As the Butte County Superior Court noted, even assuming counsel should have further investigated a mental defect defense, this case is further complicated by the unknown factor of whether, had the testimony been presented, the jury would have accepted that testimony as sufficient to reduce its verdict from murder to voluntary manslaughter. This supposition requires a significant degree of speculation. This Court cannot unequivocally state that the determination of the Butte County Superior Court that all the facts and circumstances of the case did not support a reasonable probability of a different result was not only wrong, but objectively unreasonable.

In summary, this Court cannot say that the decision of either the California Court of Appeal or the Butte County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

---

[71] Docket No. 36-1, at 49-50.

States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[72]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principles to the facts of Geren's case within the scope of *Andrade-Williams-Schriro-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Geren has failed to establish that his trial counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that Geren's defense was prejudiced, as required by *Strickland-Hill*.  Geren has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance or that his defense was somehow prejudiced.

Geren's claim of judicial bias is also not well taken.

The Supreme Court has long established that the Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge.  *See In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).  To succeed on a judicial bias claim, however, the petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).  In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *see United States v. Martin,* 278 F.3d 988, 1005 (9th Cir.2002).[73]

---

[72] 28 U.S.C. § 2254(d).

[73] *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008).

Geren contends that the "extrajudicial source" in this case is Butte County's budgetary concerns as expressed and recognized by the Butte County Superior Court. In support of this argument, Geren quotes the comment by the court at the hearing regarding payment of Dr. Victoroff's fees, to wit: "So the issue is, does a convicted murderer have the right to drain the county treasury in pursuit of a novel medical theory which might possibly show that he didn't get a fair trial? And my answer to that is, no, he does not."[74] Geren argues that this comment indicates that the ultimate denial of his petition for relief was influenced by the Butte County Superior Court's concern that a new trial would require complex expert testimony that would be too expensive a burden on the local court. Geren raised this issue in his petition to the California Supreme Court, which summarily denied the petition.

A state court is not required to give reasons before its decision can be deemed to be "adjudicated on the merits."[75] When there is no reasoned state-court decision denying an issue presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[76] "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."[77] In this case, there is no basis in the record to support a determination that the California Supreme Court did not deny relief on the merits. Where the presumption applies, this Court must perform an independent review of the record to ascertain

---

[74] Docket No. 50-5, at 8.

[75] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011).

[76] *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[77] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

whether the state-court decision was "objectively unreasonable."[78]   In conducting an independent review of the record, this Court presumes that the relevant state-court decision rested on federal grounds,[79] giving that presumed decision the same deference as a reasoned decision.[80]   The scope of this review is for clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams*. . . . Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[81]

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[82]

After Dr. Victoroff completed his direct examination on April 15, 2008, the hearing was continued to facilitate the doctor's schedule.  Before the hearing resumed, an impasse was

---

[78] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[79] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[80] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[81] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . . There, we held that where a state court provides no rational for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning. . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[82] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

reached when Dr. Victoroff declined to complete his testimony unless he was paid his going rate,

$400/hour.  Butte County was not willing to pay more than $200/hour.  The comment by the

Butte County Superior Court was made in the context of the request to increase Dr. Victoroff's

compensation from $200/hour to $400/hour.  Omitted from Geren's argument are the court's

comments immediately following the comment quoted by Geren:

> He's entitled to have effective representation of counsel, which he has through Ms. Hillberg and Mr. Battle.  He's entitled to have an expert come in.  But he's not entitled to search out the United States or the state of California and pick and choose the most expensive expert that he can find.
>
> As I said at the earlier proceedings, entitled to have, not a Cadillac, but maybe a Ford or a Chevy.
>
> Now, if Dr. Victoroff's theories are as well-founded as you profess, Ms. Hillberg, why is it that there is not a doctor in Oroville or Chico or Sacramento or Redding who can come into court and present the same theory?  And I say that there certainly must be, if his theory, if his evidence shows that.
>
> And so for those reasons, the Court is not inclined to grant Dr. Victoroff a raise in pay above the amount which Mr. Stephens said today the county feels comfortable with, which is $200 an hour.  I am willing to make that concession, based on the county.  It's the county's money, not the Court's money.
>
> So the Court at this time is not going to subpoena Dr. Victoroff.  That's in the ballpark of the defense.  If you want Dr. Victoroff to come in and complete his direct testimony and make himself available for cross-examination, you have every right to do that, provided it's within the scope and the amount of the funds approved by the Court.  So therefore, the Court is not going to order him to be here.
>
> But I am going to strike his testimony without prejudice.  That is to say, if he does show up, then the Court will reverse its order striking his testimony.
>
> This is not to say that Mr. Geren is not entitled to present evidence in support of his application for a writ.  If you come forward with more evidence, the Court will gladly hear that evidence and give each side an opportunity to pursue it.
>
> So the next step will be for the Court to review the documents which you have presented to me today as to the reasonableness, reasonableness of your fees, Ms. Hillberg.  And I will review Dr. Victoroff's claim at the rate of $200 an hour.[83]

The matter of Dr. Victoroff's compensation was then brought before this Court.  At a

hearing before the magistrate judge, it was ordered that half the expense for Dr. Victoroff would

---

[83] Docket No. 50-5, at 8-10.

be paid with federal funds, with the balance to be paid by the state.  Dr. Victoroff's testimony in

the hearing in the Butte County Superior Court then proceeded to conclusion.

Analysis starts, as it must, with the constitutionally mandated rule that, where an indigent

defendant has demonstrated that his mental condition is likely to be a significant factor in his

defense on the issue of guilt, due process requires that the state must provide him with "access to

a competent psychiatrist who will conduct an examination and assist in evaluation, preparation,

and presentation of the defense."[84]  The Supreme Court, however, also specifically explained that

the fact that an indigent defendant is entitled to a publicly funded expert does not mean that he

"has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to

hire his own."[85]  The Supreme Court also "[left] to the State the decision on how to implement

this right."[86]  California law provides in relevant part:

> (a)  In the trial of a capital case or a case under subdivision (a) of Section
> 190.05 the indigent defendant, through the defendant's counsel, may request the court
> for funds for the specific payment of investigators, experts, and others for the
> preparation or presentation of the defense.  The application for funds shall be by
> affidavit and shall specify that the funds are reasonably necessary for the preparation
> or presentation of the defense.  The fact that an application has been made shall be
> confidential and the contents of the application shall be confidential.  Upon receipt
> of an application, a judge of the court, other than the trial judge presiding over the
> case in question, shall rule on the reasonableness of the request and shall disburse an
> appropriate amount of money to the defendant's attorney.  The ruling on the
> reasonableness of the request shall be made at an in camera hearing.  In making the
> ruling, the court shall be guided by the need to provide a complete and full defense
> for the defendant.[87]

---

[84] *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

[85] *Id.*

[86] *Id.*

[87] Cal. Penal Code § 987.9 (extended to all cases by *People v. Worthy*, 167 Cal. Rptr. 402,
405-06 (Cal. Ct. App. 1990)).

The Butte County Superior Court approved a rate of $200/hour.  It is also evident that, other than the fact that Dr. Victoroff was demanding more than $200/hour, Geren did not provided any basis for payment in excess of the $200/hour rate accepted by Butte County.  Nor has Geren presented any evidence that the rate approved was unreasonable in view of the prevailing rate.  Taken in context, the Butte County Superior Court's comment is nothing more than an expression of skepticism concerning Geren's theory and the need for such an expensive expert.  The ruling was simply a refusal to give Geren and his counsel *carte blanche* in selecting an expert of their choosing.[88]  Under California law, the defendant has the burden of establishing that the requested ancillary services are reasonably necessary, and the funding of those services is within the discretion of the trial court.[89]  This Court takes judicial notice that, at the time that the question of Dr. Victoroff's compensation was brought before the Butte County Superior Court, the federal standards limited the maximum amount of expert fees in non-capital cases to $1,600 in the absence of a showing that additional funds were necessary.[90]  This Court also takes judicial notice that, in capital cases, the Judicial Council of the Ninth Circuit currently sets the presumptive maximum hourly rate for psychiatrists and neurologists at $275.[91]  Measured by that

---

[88] It does not appear that, contrary to the statutory requirement, this funding request was submitted for decision to a judge other than the judge conducting the evidentiary hearing.  No objection to the judge holding the evidentiary hearing also considering the funding request appears to have been made.  Consequently, this Court treats that defect as having been waived.

[89] *People v. Gonzales*, 256 P.3d 543, 570 (Cal. 2011).

[90] Guide to Judiciary Policy & Procedures, Vol. VII, *Appointment of Counsel in Criminal Cases*, Section A *Guidelines for the Administration of the Criminal Justice Act and Related Statutes*, published by the Administrative Office of the United States Courts, §§ 310.20.10, 320.20.30.

[91] Judicial Council of the Ninth Circuit Amended CJA Capital Habeas Costs Policy January 2010.  Accessible on-line at

standard it cannot be said that the refusal by the Butte County Superior Court to approve Dr. Victoroff's hourly rate was unreasonable.

Geren has not shown that the decision of the Butte County Superior Court was influenced by an "extrajudicial source." This Court cannot accept Geren's argument that a trial court's concern for government funds exhibits bias, and that creates a presumption of bias in each case in which a court, in the exercise of the discretion conferred by law, declined to authorize an expenditure for the lack of sufficient showing that it was reasonably necessary. That is not the law. This Court also notes that the Butte County Superior Court accepted Dr. Victoroff's testimony that a potential defense in fact existed. The ruling of the Butte County Court was based upon the court's determination that Dr. Victoroff's testimony, in conjunction with the evidence presented at the motion for a new trial, was insufficient to establish that, in failing to further investigate and discover the IED defense, Geren's trial counsel provided ineffective assistance. As noted above, Dr. Victoroff's testimony did not provide any basis upon which the Butte County Court, or any court for that matter, could disagree with the decision of the California Court of Appeal.

---

http://www.caed.uscourts.gov/caed/documents/forms/cjra/CJACapitalHabeasCostPolicy.pdf (last accessed October 7, 2010).

V.  CONCLUSION AND ORDER

Geren is not entitled to relief.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[92]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[93]

The Clerk of the Court is to enter judgment accordingly.

Dated: January 31, 2012

                                          /s/ James K. Singleton, Jr.
                                     JAMES K. SINGLETON, JR.
                                     United States District Judge

---

[92] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705-06 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's  resolution of his constitutional claims or that jurists could conclude  the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[93] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.